STATE of Missouri, Respondent,

v.

Jimmy D. DAYTON, Appellant.

No. KCD27649.

Missouri Court of Appeals, Kansas City District.

March 1, 1976.

Motion for Rehearing and/or Transfer Denied March 29, 1976.

Application to Transfer Denied May 5, 1976.

See also Mo.App., 535 S.W.2d 479.

Philip F. Cardarella, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Timothy J. Verhagen, Asst. Atty. Gen., Jefferson City, for respondent.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

SHANGLER, Judge.

The defendant Jimmy Dayton was indicted on four separate counts of felony. He was accused, in concert with others, of kidnapping two male youths and practicing upon them abominable and detestable crimes against nature. The jury returned convictions of ten years imprisonment for each count of kidnapping and ninety-nine years of imprisonment on each of the other two counts. The trial court ordered that the sentences be served consecutively.

The evidence of the State showed that Jerry Dayton and Sam Dayton, brothers of the defendant, and Millard Swenson, their uncle, were co-actors in the episodes of abduction and pederasty for which the defendant was convicted.

The defense was both alibi and innocence on the open-court testimony of Jerry Dayton that it was he and three others who had seized the youths and submitted them to torture and molestation.

The victims of these perversions were D.E., a boy of eleven years and his playmate, G.D., who was then seven years old. On the late afternoon of April 12, 1974, the

boys had rummaged a trash bin on the parking lot of the Baltimore Bank at 31st and Main and were about to leave, when a blue-green car pulled onto the lot. According to the testimony of D.E., the older of the boys, after a preliminary inquiry of street location, the two occupants identified themselves as police officers and told the boys they were in arrest for the trespass of private property. [The witness identified the defendant as the driver.] One of the men flashed a badge and ordered the boys into the car. The men then told the boys that they were in search of two others for shoplifting; the car proceeded south on Main to Linwood where they encountered two men walking down the street carrying J. C. Penney bags. The car stopped, picked them up, then proceeded to a motel [identified by photographic exhibit as the Travelodge at 3240 Broadway], and entered room 210.

It was the further testimony of D.E. that once inside the room, their abductors continued to conduct themselves as police officers; they feigned a search of the room, undertook a mock interrogation of the other two men and ordered the boys to disrobe and be searched for weapons. The men also disrobed. The boys were then made to shower on the pretext that such an amenity would not be available in jail. The boys were separated; D.E. was brought into the bedroom and the younger boy was made to remain in the bathroom.

Once in the bedroom, the defendant directed D.E. to take his penis into his mouth, but the boy refused. The boy was then made to lie on the bed, and thus prone, was gagged and blindfolded with cloth and tape, and tethered by his wrists and ankles to the four corners of the bed. D.E. testified that five separate acts of anal penetration followed, the first four by men of different weights who lay upon him in succession, and the fifth by a hard irregular object which hurt him. [The latter reference was to the dildo, an artificial priapus of exaggerated size, the boy had first seen in the bathroom of the motel and then in the bedroom strapped to the defendant.] At the time the dildo [exhibit 11] was inserted into the boy, one of the men warned the others that it would kill him, but it was applied anyway. This penetration caused the boy to scream and induced a defecation which covered the bedsheet. The boy was also shocked and hurt by the intermittent application of a cattle prod against parts of his body. At the conclusion of these molestations, the ties, gag and blindfold were removed and D.E. was released to wash in the bathroom and dress. The boys were separated once again; while D.E. was in the bathroom, his younger companion was taken into the bedroom.

The testimony of G.D. corroborated the narrative given by D.E. of abduction by two men who identified themselves as police officers, and their asportation by car to the motel in the company of the other two men picked up by the others. G.D. identified the defendant as the driver of the vehicle. He, too, was told to disrobe and bathe and remained there alone while his companion was in the bedroom. First one of the men, and then another [neither of whom he could identify], came into the bathroom and placed his penis into the mouth of the boy. Then he was taken into the bedroom, spread upon the bed and tied, gagged and blindfolded, he was subjected to a single act of rectal sodomy. Also, he was shocked by the cattle prod. G.D. recalled the defendant led him into the bedroom from the bathroom, but could not say whether he was in the room when the perversions were practiced upon him or who or how many took part.

When the boys had dressed, they were taken to the automobile, warned not to report the event, and released at the Foremost Dairy premises at 31st and Gilham Road. Immediately upon their return home, each boy reported what had happened to his parents. The mother of G.D. noticed rope burns on the hands and legs of her son. [D.E. testified that similar impressions had been made on his body.] She testified that her son arrived home about 8 P.M. on that day and that she had last seen him with D.E. at about 4:00 P.M. Thus,

although neither of the boys could remember the time of the criminal events at the trial, it is apparent that they took place sometime between those hours. The police were called and they responded shortly after 9:00 P.M. The boys were taken to Childrens Mercy Hospital for examination. D.E. was found to have suffered a tear of the anal mucosa; the findings on the medical examination of G.D. were not disclosed in evidence.

The older of the two boys, D.E., then led Officer Dale Meadows and Detective Bernard Gowin of the Kansas City police department to the site of the abduction, and then led them along the same route they had been taken to the motel. He told of the blue-green Chevrolet, gave a general description of the four suspects, the badge and other paraphernalia used in the crimes. At the motel parking lot, D.E. pointed out the car, and then led the officers to room 210. The officers learned from the desk that the room was let to the defendant, his two brothers and uncle. In order to avoid a confrontation between D.E. and the suspects, the boy was left with the manager. It was about 1:00 A.M. when the officers knocked on the door of room 210 and were admitted. They found the three Dayton brothers and Swenson ready for bed. The four suspects were arrested and a search of the premises recovered tape from a receptacle in the bed area, towels, washcloths and bedpad from the bathroom. These were given to a police evidence technician at the scene for laboratory analysis. He testified that towel and cloth were stained red and yellow, and that marks of blood and defecation appeared on the bedpad. A search of Sam Dayton revealed a knife [identified by G.D. as the weapon wielded by one of the abductors].

As the men were led to the police wagon, Sam Dayton asked Officer Gowin for his jacket from the car. He gave the officer the key to the Chevrolet. Gowin then picked up the jacket from the car seat and noticed a wallet which was found to contain a badge with the inscription: *Special Police, Maryland.* The four suspects were taken to the police station where Officer Gowin conducted a line-up.

Six men comprised the line-up; the four suspects and two others. The two boys were kept separate and free from suggestion during the identification procedure; each was given a card for the notation of the number designation of any of the men on view who had been involved in the events earlier that day. The numbers noted by D.E. identified the three Daytons and Swenson as the men who had abused him. At the trial, he identified the same four men from a photograph of the line-up taken by Gowin. The younger boy, G.D., picked three from among the six men at the line-up, Jerry Dayton, Millard Swenson and the defendant Jimmy Dayton, but identified all four from the photograph at the trial.

The final witness for the prosecution was Doctor Matthias Yoong, a forensic chemist, who examined the property impounded by Mosby, the police evidence technician. He obtained cranial hair standards from the two boys and the four suspects for comparison with hair filaments taken from the tapes found in the motel room receptacle. The strands from the tapes fell within the limits of variance of the cranial standards taken from the two boys, but not within those taken from any of the suspects. Hairs collected from the bedpad were compared with standards taken from the four men and were found to fall within the limits of the head hair standards taken from Sam Dayton and Millard Swenson. Doctor Yoong also found seminal and fecal stains on the bedpad, blood on the washcloths, and seminal stains on the towel.

The defense was alibi. The defendant Jimmy Dayton testified that he had come to Kansas City from his Maryland residence and registered at the Travelodge Motel. On the day of events in issue, he with his brothers, Jerry and Sam, and uncle, Millard, left the motel at about noon for the residence of one Tyler. Once there, he spent the afternoon in an upper bedchamber with Susan Hogan, who lived there with the Tylers, and did not emerge until about 5 P.M. He, brothers and uncle, left about 9

P.M. but did not arrive at the motel until after 10:30 P.M. They found the room in disarray. It was not until two weeks later that his brother Jerry told him that he and three others, strangers to the defendant, had abducted and molested the two boys.

The brother of the defendant, Jerry Dayton, also under indictment for the same charges, corroborated the testimony of the defendant that the four kinsmen left the motel at about noon of the day in question for the Tyler residence. There an argument developed between Jerry and brother Sam concerning the attentions of Patty McCormick, one of the guests, so at about 2:30 P.M. he left in the Chevrolet. He drove around, sniffed glue, drank beer, and about an hour later, joined four men with whom he had worked in the carnival [Billy Smith, Paul Asher, Hurst Jones and Hip]. At the bank lot, they abducted the boys, took them to the motel room, tortured and abused them, and finally released them at about 9 P.M. at a dairy stand. Jerry Dayton testified that he lured the boys with the defendant's special police badge, told them they were going to jail, required them to undress and bathe, blindfolded and gagged the boys, and in turn staked each to the bed. Hurst Jones became frightened at these antics and left. The remaining four each forced rectal intercourse with D.E. One of them, Asher, penetrated D.E. with a dildo which induced defecation and rectal bleeding. It was the further testimony of Jerry Dayton that the younger boy, G.D., was forced to take into his mouth the penis of two of the men, and to submit to the rectal sodomy of one other. This boy was also tortured by cattle prod.

On cross-examination, the witness acknowledged that he was suffering from cancer but denied that it was terminal or that his testimony was prompted by such an extremity.

The defense presented the testimony of two other alibi witnesses, Edna Sue Hogan and Thomas Raye, both resident guests at the Tyler home on April 12, 1974, the day in issue. Ms. Hogan, seventeen years of age, admitted to conviction for burglary in complicity with Mary Dayton, sister of the defendant. It was her testimony that on that day, the three Daytons and Swenson arrived at the Tyler home at about noon and left together at about 9:30 P.M. She remembered well because on that afternoon she had yielded her maidenhood to the blandishments of the defendant in the bedchamber. Her testimony was equivocal as to whether Jerry was in the house when she and the defendant emerged from the bedroom at about 5:00 P.M.

The other witness, Tom Raye, saw the four arrive and then leave at about 9:30 P.M. He had been occupied for hours on a telephone in an upper room during their stay and did not say with any definiteness whether he saw Jerry between those hours.

On this appeal, the defendant brings a congeries of errors, most of which were not assigned on motion for new trial and are asserted as plain error. Among them, the contentions that:

1. the motel bathroom and automobile were subjected to illegal searches and that the seizure of linens and other accoutrements from the bedroom, and the discovery of the badge in the car, were fruits of warrantless and excessive searches;

2. The testimony of G.D. did not evince a sufficient memory of independent recollection of the observations of the alleged offense and should have been excluded;

3. The testimony of G.D. was suggested to him by leading questions and should have been excluded;

4. The identification of the defendant by the boys was induced by a suggestive line-up and should have been excluded; and

5. the closing argument of the prosecutor was so calculated to inflame the jury and arouse their prejudice against the defendant as to deprive him of due process of law.

Two other points, actually of single import, were preserved for our review and raise the contention that exculpatory evidence had been withheld from the defend-

ant in violation of due process and the rules of criminal discovery.

▆▆▆▆ Rule 27.20(c) which allows consideration on appeal of plain errors affecting substantial rights though not preserved for review does not propose to meliorate every trial lapse but only those of constitutional dimension. *State v. Beasley*, 404 S.W.2d 689, 690[1, 2] (Mo.1966); *State v. Murphy*, 521 S.W.2d 22, 25[2–4] (Mo.App.1975). The grant of relief by this rule, however, is one of discretion and conscience, and is rightly given only in cases where justice has miscarried. *State v. Meiers*, 412 S.W.2d 478, 480[1] (Mo.1967). There are constitutional errors which are legitimately refused consideration even under the plain error rule as where the procedures adopted to ensure orderly presentation and determination of such claims have not been met. Thus, a contention that a search and seizure were unlawful made for the first time on appeal may not generally be recognized. The procedures of Rule 33.03 provide that the adjudication of that issue shall be made by a motion made, in advance of trial, to suppress the evidence so obtained. The movant has then the burden to sustain the contention by evidence, to keep the issue alive by timely objection, and to preserve it by motion for new trial. *State v. Fields*, 442 S.W.2d 30, 33 (Mo.1969); *State v. Yowell*, 513 S.W.2d 397, 402[1, 2] (Mo. banc 1974). This procedure for contemporaneous objection at the trial as a condition for review of an unlawful search and seizure claim serves a valid state interest and therefore does not deny due process of law. *Henry v. Mississippi*, 379 U.S. 443, 448[6, 7], 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). The interest served is the formulation by evidentiary hearing on the motion to suppress of a record which allows informed appellate review. *State v. Thompson*, 490 S.W.2d 50, 52[2] (Mo.1973).

▆▆▆▆ The brief of the defendant on appeal asserts for the first time that the conviction of the defendant rests on evidence discovered as the result of an illegal foray by police into the lavatory of the motel room and an excessive search of the automobile. The contentions are that these searches, without formal warrants, were not otherwise incident to the arrest; that although the law allows search incident to a lawful arrest to prevent the suspect from access to a weapon or the destruction of evidence, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) confines such police activity to an area within the control of the arrestee, which under the circumstances excludes the motel bathroom. The other contention is that the badge was discovered as the result of an exploratory automobile search; that although the initial access to the vehicle was legitimate response by the police to the request by an arrestee for his coat, the badge was encased and not in plain view, and thus the search and seizure fall within the condemnation of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

These contentions were not presented to the trial court; there was neither pretrial motion to suppress, nor objection at the trial to the admission of the evidence, nor preservation for review in the motion for new trial. The same void which inhibits review of these issues in the normal course inhibits review as plain error: a record which lacks pertinent data. In the serious circumstances presented, in consideration that the evidence the defendant impugns as illegal so pervaded the trial and the judgment, we would have been disposed to a review of the searches and seizures under Rule 27.20(c) had these issues been formulated by evidence on a motion to suppress, even though the defendant may not otherwise have objected to the admission of the evidence at the trial or assigned the error in the motion for new trial. See: *State v. Yowell, supra*, l. c. 402[1, 2]. But the State here was not allowed opportunity to justify the search which a motion to suppress may have proved. The evidence as it came in at the trial was not oriented to the validity of the searches, but to the discovery of the evidence. Even this random record suggests consent to the automobile seizure and the discovery of evidence open to view in the bathroom. See: *State v. Thompson*,

*supra*, l. c. 52[2]. These assignments are denied review as plain error.

The next points relate to the competency of G.D. to give testimony and to an alleged prejudice to the defendant from suggestive questions asked of the boy by the prosecutor. These are contentions of trial error and are not subject to remedy under the plain error rule. *State v. Murphy, supra*, l. c. 25[2–4]; *State v. Smith*, 261 S.W.2d 50, 55[4, 6] (Mo.1953). They were not preserved for appellate review, so we do not reach their merits. It is sufficient to say that the voir dire examination of the witness satisfied all the tests of competency of a child who gives testimony. See: *State v. Young*, 477 S.W.2d 114, 116[1, 2] (Mo. 1972). As to the suggestiveness of the questions, in the most important particulars the responses were not elicited and were otherwise corroborated by other evidence. The prosecutor did lead the child and aid him to describe, in his own idiom, the phallus and the act of fellatio, but that was more a matter of delicacy than advantage. These points are denied review as plain error.

The claim that the line-up identifications of the defendant by the boys were suggested is also presented as plain error. The defendant did not move to suppress the identifications, nor object at the trial to the photographs of the procedure, thus his appellate position lacks systematic development in the record. The contentions here are that the line-up was exhibited early in the morning, a time when the boys were weary and sleepy, and that the array of the four suspects with only two others was so suggestive as to have induced the identifications as virtually inevitable. These criticisms are trivial. The evidence shows that at the time of the line-up the boys were alert, separated from each other, and carefully instructed in the identification procedure. The record affirmatively shows that they were kept from the undue police suggestion. *State v. Word*, 527 S.W.2d 708, 710[2, 3] (Mo.App.1975). Nor does the contention that only one of the persons on line-up exhibited facial hair render the procedure invalid. The law does not require such exactness of physical and personal features of the participants.

In any event, the uninterrupted exposure over a prolonged time to the physical presences of the four suspects provides an independent basis for their court identification of the defendant as an abductor and assailant. This point is denied.

The final contention of plain error is that the display of the artificial penis during the closing argument and other comment inflamed the passion and prejudice of the jury. The closing argument went without objection by the defendant. There is no suggestion here why the artificial device, otherwise legitimate evidence, should have been kept from the view of the jury. The contention is made that the exhibit as well as certain excerpted portions of argument were calculated to arouse the personal hostility of the jurors towards the defendant and resulted in the denial of due process. We have reviewed the record with care and conclude that the argument of the prosecutor was fair comment on the evidence. The point is denied.

The appellant next contends here, as did his motion for new trial, that the sentences of ninety-nine years on each count of sodomy constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The punishment was within the statutory allowance and therefore, as a matter of law, is neither cruel nor unusual. *State v. Vermillion*, 486 S.W.2d 437, 441[9] (Mo. 1972).

In his motion for new trial the defendant also contends that the failure of the prosecutor to disclose certain evidence was a denial of due process and, cumulatively, Rule 25 which relates to discovery in felony causes.

The defendant had made pre-trial request of the State for discovery under Rule 25.32 for disclosure of

(5) Any reports or statements of experts, made in connection with the particu-

lar case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons;

(9) Any material or information, within the possession or control of the state, which tends to negate the guilt of the defendant as to the offense charged, or reduce the punishment.

At the hearing on the motion for new trial, the state acknowledged that prior to the trial the State had received a written report of the physical examination of G.D., the younger boy, made by Dr. Joseph Gialde on the night of the offense. The report contained statements made by the boy to Dr. Gialde, but neither the report nor the statements was disclosed to the defendant. The portion of the report which the defendant contends was withheld to his prejudice stated:

On specific and direct questioning, he [G.D.] denies any felatio (sic) or anal penetration [with] any object at all. States that men did not strike him at all.

The defendant asserts that he was denied fundamental fairness by the nondisclosure because this statement contradicts the testimony of the complainant, and thus would have been admissible not only for impeachment but also as direct proof that sodomy was not committed upon the boy. The defendant cites *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) for the principle that

[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to the guilt or punishment, irrespective of the good or bad faith of the prosecution.

This is a duty which our courts have also recognized and which discovery Rule 25.32 [1] reposes on the prosecutor. *State v. Abernathy*, 525 S.W.2d 414, 416 (Mo.App.1975).

On the motion for new trial, the prosecutor sought excuse for the nondisclosure on the contention that, in response to the discovery request, he had opened his file to the defendant, but by some misadventure the medical report was overlooked by the defendant or misplaced by the prosecutor, and that the State should not be penalized for such an innocent neglect. The deception from a negligent nondisclosure causes no less injury to the administration of criminal justice than a suppression made by design or guile. The duty to disclose, whether under *Brady* or Rule 25.32, rests on the prosecutor, and the material and information are within his possession or control, the cause of his failure cannot soften the sanction. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Levin v. Katzenbach*, 124 U.S.App.D.C. 158, 363 F.2d 287, 290[2] (1966). The questions remain whether the evidence requested suppressed was favorable to the defendant and material on guilt or punishment. *Brady v. Maryland, supra*, 373 U.S. 1. c. 86, 83 S.Ct. 1194. The *Brady* requirement of materiality is satisfied when the evidence does no more than impeach the credibility of a witness whose testimony prejudiced the defense. *State v. McClain*, 498 S.W.2d 798, 799 (Mo. banc 1973). And, certainly, the purpose of Rule 25.32 includes opportunity to a defendant to prepare in advance of trial for the impeachment of a witness by his own statement. *State v. Buckner*, 526 S.W.2d 387, 392[3, 4] (Mo.App.1975).

It is the contention of the State that, notwithstanding nondisclosure, the evidence of Jerry Dayton for the defendant admitted that G.D. had been assaulted, forced to the act of fellatio, and tortured with a prod, so that the statement by the boy to Dr. Gialde was not material on any issue and, even if available, could not have affected the outcome of the trial. The defendant complains

---

1. Rule 25.32:

(A) Except as otherwise provided in these Rules as to protective orders, the state shall, upon written request of defendant's counsel, disclose to defendant's counsel such part or all of the following material and information within its possession or control designated in said request: (9) Any material or information, within the possession or control of the state, which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment.

that the nondisclosure shaped a strategy of defense which proceeded on the assumption that the prosecutor had met his duty to make discovery.

▇▇▇▇ Whether prejudice results in a given case depends upon the nature of the charge, the evidence presented by the State, and the role the undisclosed testimony would likely have played. *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 847[6] (4th Cir. 1964). It is clear that the medical document was relevant only upon Count III, the allegation of sodomy by the defendant upon G.D., and did not bear upon either count of abduction or the molestation of the other boy, D.E. The statement by G.D. to Dr. Gialde affected the other charges only to the extent that the conflict between his statement to the physician and his trial testimony may have disparaged the credibility of the boy before the jury. The proof by G.D. of the other counts was merely corroborative of the other sufficient and clear testimony of guilt and, in reasonable likelihood, the failure to disclose the contradictory statement made by G.D. to the physician would not have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Ingram v. Peyton*, 367 F.2d 933, 936[3] (4th Cir. 1966); *State v. Allen*, 530 S.W.2d 415, 419[3] (Mo.App.1975). As to Count III, the specific sexual abuses upon his person narrated by G.D. at the trial were proved independently by the defense, and unless we are to believe that the testimony of Jerry Dayton was contrived—an assumption we are unwilling to make—it is not apparent how the nondisclosure worked the defendant prejudice. We conclude, accordingly, that the evidence was not of a character to raise a reasonable likelihood that, if known at the trial, would have affected the result.

▇▇▇▇ We reverse and remand the cause for retrial of Count III, however, because the judgment entered was on a submission without support in the evidence. In doing so, we deny the contention that the defendant was entitled to acquittal because the evidence was not responsive to the indictment.

Count III of the indictment undertook to charge the abominable and detestable crime against nature, an offense created by § 563.230, RSMo 1969. In terms, that section provides that

> Every person who shall be convicted of the detestable and abominable crime against nature, committed with mankind or with beast, with the sexual organs or with the mouth, shall be punished by imprisonment in the penitentiary not less than two years.

The accusation of the indictment charged that

> [O]ne JIMMY D. DAYTON . . . did then and there unlawfully, feloniously, either alone or knowingly acting in concert with others, and wickedly and against the order of nature, commit the abdominal and detestable crime against nature by then and there inserting the penis of him, the said JIMMY D. DAYTON into the mouth of G. . . D. . . .

In fact, there was no proof that it was the sexual organ of the defendant which was placed into the mouth of the boy. According to the State, the incident occurred in the bathroom when G.D. was separated from his older companion who was then under assault in the bedroom. G.D. could not identify which of the four men accosted him in the bathroom, and D.E. did not know what happened to the other boy during their separation. The evidence of the defendant disclaimed that he was involved in any manner.

▇▇▇▇ The contention is not that Count III of the indictment fails to fairly charge sodomy against the defendant, but that the allegations of that accusation require proof that it was the procreative organ of the defendant which was placed in the mouth of G.D., and without such proof the conviction may not stand. The purpose of an indictment is to enable the accused to make his defense and to enable him to assert double jeopardy in bar of a further prosecution; it is also the pleading by which the

court determines whether the facts alleged are sufficient to support a conviction. *State v. Moore*, 501 S.W.2d 197, 199[3, 4] (Mo.App.1973).

The term sodomy embraces any unnatural corporeal copulation [*State v. Oswald*, 306 S.W.2d 559, 562[4–6] (Mo.1957)], and on penetration the crime becomes complete. *State v. Wilson*, 361 Mo. 78, 233 S.W.2d 686, 688[2] (1950). As with other crimes, all persons who knowingly participate in the perpetration of sodomy upon another are equally guilty of the offense. *State v. Cain*, 507 S.W.2d 437, 440[3] (Mo. App.1974). Sodomy is of a vile and degrading nature, and for that reason, the strict rules of pleading have not been followed in charging the crime. 70 Am.Jur.2d 818, § 17. As long as the act of sodomy charged falls within the statutory definition and the indictment informs the accused of the charge against him, the details of the commission are generally unnecessary. 81 C.J.S. Sodomy § 4. The indictment was a statement sufficient to inform the defendant that he, in concert with others, inserted a male penis into the mouth of G.D. That, also, was the proof. Thus, the defendant was accused as an aider and abettor and is treated in our law as a principal. § 556.170, RSMo 1969. The State need not plead evidence in an indictment, thus the facts by which the defendant aided and abetted the commission of the crime were not essential to the validity of the accusation. *State v. Spica*, 389 S.W.2d 35, 40[1–4] (Mo.1965). Accordingly, the phrases *of him, the said JIMMY D. DAYTON,* which appears within the indictment pleading

JIMMY D. DAYTON . . . either alone or in knowingly acting in concert with others, and wickedly and against the order of nature [did] commit the abominable and detestable crime against nature by then and there inserting the penis *of him, the said JIMMY D. DAYTON* into the mouth of G.D.

stands as mere surplusage to the otherwise sufficient allegation of sodomy against the defendant as a principal who aided and abetted the crime. *State v. Lemon*, 504 S.W.2d 676, 681[3, 4] (Mo.App.1973).

Although the evidence was responsive to the indictment allegation that the defendant acted in concert to commit the crime, the judgment was corrupted by a submission which did not conform to the facts proved. Instruction No. 8 directed a conviction on Count III if the jury found that the defendant "either alone or knowingly acting in concert with others, inserted *his* penis into the mouth of G.D." There was no evidence whose organ consummated the perversion. Instructions in a criminal case must rest on substantial evidence, otherwise the conviction rests on conjecture and must be set aside. *State v. Cole*, 377 S.W.2d 306, 307[1, 2] (Mo.1964); *State v. Lemon, supra,* l. c. 681[3, 4].

The judgments on Counts I, II and IV are affirmed; the judgment on Count III is reversed and remanded for new trial.

All concur.